UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                    Plaintiff,

                                                          **DECISION AND ORDER**
                                                          19-CR-170-A

              v.

ALPHONSO PAYNE,

                                    Defendant.

On June 20, 2025, after about five weeks of trial, a jury returned a verdict of

guilty (Dkt. No. 997) on all ten counts of the redacted indictment (Dkt. No. 977),

finding Defendant Alphonso Payne guilty of conspiracy to possess with intent to

distribute, and to distribute, various controlled substances, in violation of 21 U.S.C.

§§ 846, 841(a)(1), and 841(b)(1)(C) (Count 1); possession with intent to distribute,

and distribution of, cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C)

(Counts 2 and 3); possession of firearms in furtherance of a drug trafficking crime, in

violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 4); conspiracy to murder a federal

informant, in violation of 18 U.S.C. § 1512(k) (Count 5); murder of a federal

informant, in violation of 18 U.S.C. §§ 1512(a)(1)(A), 1512(a)(1)(C), and

1512(a)(3)(A) (Count 6); conspiracy to retaliate against a federal informant, in

violation of 18 U.S.C. § 1513(f) (Count 7); retaliating against a federal informant, in

violation of 18 U.S.C. §§ 1513(a)(1)(B) and 1513(a)(2)(A) (Count 8); discharge of a

firearm in furtherance of crimes of violence and a drug trafficking crime, in violation

of 18 U.S.C. § 924(c)(1)(A)(iii) (Count 9); and discharge of a firearm causing death
in furtherance of crimes of violence and a drug trafficking crime, in violation of 18
U.S.C. §§ 924(c)(1)(A)(iii) and 924(j)(1) (Count 10).  Defendant's convictions on
Counts 5 through 10 stemmed from his participation in the shooting death of Joshua
Jalovick on July 1, 2019.  The jury made special findings on Counts 5 through 8, and
10, that Defendant acted with malice aforethought and premeditation, that is,
committed murder in the first degree, in violation of 18 U.S.C. § 1111.

After the Government rested at trial, Defendant moved for a judgment of
acquittal notwithstanding the jury's verdict under Federal Rule of Criminal Procedure
29, which the Court denied from the bench, except for striking marijuana from Count
1 such that the only objects of the charged drug conspiracy as submitted to the jury
were cocaine, cocaine base, and heroin.  On August 11, 2025, Defendant filed post-
trial motions (Dkt. No. 1035),[1] renewing his Rule 29 motion and alternatively moving

---

[1] Defense counsel filed a motion to dismiss (Dkt. No. 920) the Second Superseding
Indictment on Sixth Amendment speedy trial grounds on May 9, 2025, two business
days before trial was scheduled to commence.  The Court elected to defer its decision
on the motion to dismiss until after the conclusion of trial.  On the date the jury verdict
was returned, the Court set a scheduling order on the motion to dismiss and deferred
setting a scheduling order for any post-trial motions until after the motion to dismiss was
resolved.  On July 23, 2025, the Court issued a Decision and Order (Dkt. No. 1018)
denying the motion to dismiss, which is when it set a schedule for the filing of post-trial
motions.

The defense complains that Defendant's post-trial motions—comprising almost
50 pages of argument and unaccompanied by any request to file an oversized brief as
required by the WDNY's local rules, *see* L. R. Crim. P. 12(c)—were "prepared and
submitted without the benefit of a full set of trial transcripts."  The defense argues that
absent such transcripts, counsel is unable to "identify and assert fully or effectively
every meritorious ground for Rule 29 and/or Rule 33 relief."  The Court previously and
thoroughly explained its reasoning behind denying the transcripts request (*see* Dkt.

for a new trial pursuant to Federal Rule of Criminal Procedure 33.  The Government

filed a response (Dkt. No. 1046) in opposition to the post-trial motions.  Oral

argument was heard on September 2, 2025, and the Court reserved decision.  For

the reasons stated below, the post-trial motions are DENIED.

## BACKGROUND

The extensive procedural history and the facts in this case have been

discussed in this Court's prior decisions.  Familiarity with those decisions, as well as

the evidence presented at trial, is presumed.  With respect to Defendant's Rule 29

motion, the following is a summary of the evidence,[2] viewed "in the light most

---

1018, n.17), a request this Court does not recall ever seeing before aside from for
purposes of an appeal in its 37 years on the bench.

The defense further takes issue with the Court's order requiring the filing of post-
trial motions "within just 13 business days" of the Court's July 23, 2025, Decision and
Order, that is, by no later than August 11, 2025, rather than affording the defense a 90-
day turnaround after the entire trial transcript had been ordered and filed as the defense
requested on the date of the jury verdict.  "Generally, the Federal Rules of Criminal
Procedure require a defendant to file either a Rule 29 or a Rule 33 motion within 14
days after the verdict or finding of guilty where, as here, the motion is not based on
newly discovered evidence."  *United States v. Knighton*, 12-CR-56S, 2015 U.S. Dist.
LEXIS 155049, *1 (W.D.N.Y. Nov. 6, 2015), citing Fed. R. Crim. P. 29(c)(1) and Fed. R.
Crim. P. 33(b)(2).  The 14-day deadline, which includes weekends and holidays (*see*
Fed. R. Crim. P. 45(a)(1)), signals to this Court that a quick resolution of post-trial
motions is generally intended.  Thus, the Court imposed a very reasonable—and, in its
view, generous—deadline that was 52 days after the verdict and 19 days after issuance
of its Decision and Order on the motion to dismiss.  The Court also notes there was
nothing preventing defense counsel from beginning to prepare Defendant's post-trial
motions immediately after the verdict was rendered.

[2] The Court's summary is based upon its notes and independent recollection of the
proof at trial.  Given the volume of evidence presented at trial, "[t]he Court's summary of
the evidence does not include, or attempt to include, all of the evidence on which the
jury might have reasonably relied in reaching its verdict."  *United States v. Parks*, 3:19-
CR-00299 (KAD), 2023 U.S. Dist. LEXIS 143122, *4 n.2 (D. Conn. Aug. 16, 2023).

favorable to the government, with all reasonable inferences drawn in its favor."

*United States v. Rowland*, 826 F.3d 100, 105 n.1 (2d Cir. 2016) (quotations omitted).

On September 26, 2018, Jalovick entered into a confidential informant agreement with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), by which he agreed to provide information concerning Gregory Hay, a suspected firearms trafficker and controlled substances distributor, to ATF Special Agent Paul Brostko and Buffalo Police Department ("BPD") Detective and ATF Task Force Officer Michael Acquino.  After meeting with investigators, Jalovick provided *in camera* testimony to an Erie County Judge, supplying information to secure multiple search warrants, including for Hay's residence at 9 Dignity Lane in Buffalo, New York.  On May 6, 2019, Jalovick contacted Hay and confirmed Hay was out-of-town in Olean, New York, as the BPD and ATF were preparing to execute the search warrants the next day.

On May 7, 2019, a search warrant was executed at Hay's residence and ammunition and weapons, including two Glock handguns and an AR-15 short-barreled rifle, were seized.  Hay was arrested later that day in Olean and charged with New York State felonies.  Agent Brostko investigated potential federal charges against Hay, including felon in possession of firearms and possession of a short-barreled rifle, and Officer Acquino told Hay during Hay's post-arrest interview at BPD headquarters that Hay's case could "go federal" because he was a convicted felon, meaning he could be facing greater penalties.  A second search warrant was also executed on May 7, 2019, at 44 Sidney Street in Buffalo, a residence associated

with Keandre Woodard, and drugs and firearms including another Glock handgun were recovered. Woodard also faced serious charges due to that search.

Both Hay and Woodard testified at Defendant's trial. Hay, a co-defendant who was also charged in the multi-drug conspiracy and with shooting and killing Jalovick, testified pursuant to a cooperation agreement. Hay and Woodard explained they were angry that they were facing charges based on the search warrants that were executed at their houses. Only a few people could have provided information that led to the search of Hay's residence because not many individuals knew where he lived. After narrowing down who could have informed on them, between May 7, 2019, and July 1, 2019, Woodard and Hay, together with Defendant, who was close with Hay and sold drugs with Hay, had multiple discussions about killing Jalovick, who they had determined was likely working for law enforcement, calling him a "rat." While Defendant was not present for all such conversations, he was around for some of them. They made two unsuccessful attempts to kill Jalovick in that timeframe, prior to the events of July 1, 2019.

Hay also testified that he stored firearms, including the eventual murder weapons, at Defendant's house after the search on May 7, 2019. Additionally, Defendant purchased .45-caliber, hollow-point ammunition, which he and Hay used on July 1, 2019, to kill Jalovick in the backyard of 87 Freund Street, Buffalo, New York. Firearms examiner Jennifer Coombs testified that five of the bullets she examined from the crime scene at the CPS laboratory were from the .45-caliber class of bullets, with similar rifling characteristics to semi-automatic Glock pistols. The five bullets had red polymer tips, which are used to create a larger hole in the

5

target, as such tips allow for a consistent expanding or "mushrooming" in the body of the victim. Coombs testified that a semi-automatic mechanically ejects fired cartridge cases while fired cartridge cases will remain in the cylinder of a revolver until they are manually removed.

In the early morning of July 1, 2019, Hay searched "shooting a judge pistol" on YouTube and watched several videos demonstrating how to shoot a Taurus Judge.[3] About one hour prior to Jalovick's murder, according to Hay's testimony, Hay and Defendant went to Defendant's residence on Langfield in Buffalo, where Defendant lived with relatives, to retrieve the murder weapons. Defendant grabbed a .45 Glock semi-automatic pistol, and Hay grabbed a Taurus Judge revolver, before the two got into Hay's black Impala and drove to 87 Freund Street.

The murder occurred at 6:04 p.m. in the backyard of 87 Freund Street. Hay and Defendant showed off their weapons after they arrived. At approximately 5:30 p.m., Hay lured Jalovick into the backyard by calling him on a "burner phone," and when Jalovick arrived driving a red Chevy Cruze, Hay provided him $100 to purchase a bottle of D'ussé liquor to drink during the dice game that was taking place in the backyard. Jalovick and his girlfriend then went to Ideal Wine & Liquor on East Delevan Avenue, not far from 87 Freund Street, and purchased the D'ussé.[4]

---

[3] *See* Gov't Ex. #202B.

[4] *See* Gov't Ex. #98A (video surveillance footage from Ideal Wine & Liquor from 5:36 p.m., depicting Jalovick's girlfriend making a purchase and leaving the store with a brown bag); Gov't Ex. #223B (photograph of the D'ussé liquor bottle, which had a distinctive shape and was embellished with a double-barred golden cross, posted to Jalovick's Facebook account).

While Jalovick went to the liquor store, Hay offered money to individuals in the backyard to kill Jalovick upon his return. Defendant told Hay that he did not need to pay for something they could do themselves. Shortly after Jalovick returned to the backyard, Defendant, who was positioned by the back fence—but close to the dice game Jalovick was engaged in on the concrete pad—fired approximately eleven shots at Jalovick in quick succession with the Glock. The dice players scattered in different directions away from the shooting, some running down the driveway and others jumping over the fence along the side of the backyard. Hay, who was positioned by the driveway, ran back and shot Jalovick five more times with his Judge. Audio of the shooting was played at trial and corroborated that there were two shooters and that the first group of shots were from a semi-automatic weapon.[5]

The Government called several witnesses who were present in the backyard at the time Jalovick was murdered, including Raejah Blackwell, Daeshawn Stevenson, and Eric Brooks. Blackwell was close enough to Jalovick when he was shot for blood to splatter the back of her t-shirt and blue jeans. While there were some differences between the eyewitnesses' testimony concerning details of Jalovick's murder, all three testified at trial that Defendant shot Jalovick.

Following the shooting, Hay and Defendant fled the scene in Hay's Impala, and Hay could tell that Defendant "shot the whole clip." They first hurried back to

---

[5] Gov't Ex. #96. The BPD retrieved this video surveillance footage from 82 Fisher Street, which is on the next block over from Freund Street. The video captured the audio of the shots being fired, but it visually captured only a view of another house and garage and nothing of evidentiary significance in terms of identifying the shooters.

Langfield to get rid of the guns as well as Hay's cell phone and then met up with Woodard on Roosevelt Street to tell Woodard they had shot and killed Jalovick. Woodard testified that Hay and Defendant acted happy when recounting the events of the murder. At 6:30 p.m., 26 minutes after the murder, Defendant unfriended Jalovick on Facebook.[6]

Dr. Alexandra Hart, the Medical Examiner, who performed a full autopsy of Jalovick's body on July 2, 2019, testified that the cause of death was multiple gunshot wounds and the manner of death was homicide. She also testified that it was one of the most complex autopsies she had done in her career, as there were a couple-dozen gunshot wounds to analyze. About 18 projectiles injured Jalovick, although some projectiles were associated with both entrance and exit wounds.[7]

In mid-August of 2019, ATF Special Agent Adam Zeithammel, who was assigned to ATF's Pensacola field office in Florida, was contacted by Agent Brostko to assist him in locating Defendant, who had an active warrant out of Buffalo for a drug-related offense. They ultimately obtained Defendant's mother's address in Pensacola, and arrested Defendant at that address on August 20, 2019. Defendant

---

[6] *See* Gov't Ex. #222B, 222B-006; *see also* Court Ex. #8 (stipulations regarding Facebook records); Court Ex. #10 (stipulation regarding UTC time conversion in business records, including that EDT is used during daylight savings time in the summer months in New York State, which is 4 hours behind UTC). The name on the Facebook account was "Michael Sosa." Agent Brostko's testimony linked Jalovick to this account, including with Jalovick's telephone number that Agent Brostko used to communicate with him.

[7] *See* Gov't Ex. #115A (body diagram of gunshot wounds, marked as A-FF, excluding EE); *see also* Gov't Ex. ##91AE, 91AW, 91BI, 91CA, 91DJ (photographs from autopsy).

was then transported to ATF's Pensacola field office, advised of his *Miranda* rights, and interviewed that same day by Agent Brostko and Agent Zeithammel.

During Defendant's video- and audio-recorded custodial interview, he first denied being at 87 Freund Street at any point on July 1, 2019.  He claimed that he was instead at his cousin's house at 366 Langfield.  Shortly after a break in questioning, Defendant admitted to law enforcement that he had lied about his location and instead stated he was in the backyard minutes before Jalovick was murdered.  Defendant claimed that he received a phone call from his child's mother before the shooting and walked to the front of 87 Freund Street, where Hay's car was parked, to speak with her privately over the phone.  While sitting in the car, Defendant heard gunshots and observed everyone running.  According to Defendant, Hay then arrived at the car and the two of them drove off.  Defendant asked Hay what had happened.  Hay told him to "shut up," and dropped Defendant off at 366 Langfield.  Defendant's mother called him later about the killing and that is when he went onto Facebook to learn what had occurred.

In addition to Defendant's conflicting explanations to law enforcement about where he was at the time of the murder, the Government called as a trial witness Keshone Powers, who first met Defendant at the Santa Rosa County Jail (a federal detention center) when they were housed there together for about 30 days in August of 2019.

Specifically, Powers testified that Defendant confided in him about a confidential informant who had sold Defendant a gram of cocaine.  The confidential informant was Jalovick, although Defendant never informed Powers of the

9

informant's name.  Defendant later asked in general terms if a person could be convicted of murder without any murder weapons.  Defendant eventually admitted to Powers that he and Hay, who Defendant referred to as his "brother" and who Defendant clearly looked up to and regarded highly, had killed Jalovick when their suspicions were confirmed that Jalovick was the one informing on them.  Defendant told Powers of their plans to kill Jalovick and described details of the murder itself, including how Defendant shot a ".45" and "about emptied the clip" before running, looking back, and seeing Hay standing over Jalovick and hearing a couple more shots.  Defendant also mentioned to Powers he was worried about an individual in the backyard who had turned around and may have observed Defendant shoot Jalovick.  Defendant used derogatory terms when describing this potential eyewitness to Powers, and other evidence at trial established that the individual Defendant was referring to was Blackwell.

Powers also testified that Defendant came up with an alibi, as he was aware from his post-arrest interview that others were already saying he was in the backyard.  Defendant asked Powers to contact from jail the mother of Defendant's child, La'Trise Williams, and to convey to her the substance of a handwritten note that Defendant gave to Powers.  That note, which was entered into evidence at trial,[8] indicated, *inter alia*, "tell my Bm [baby mama] to Make sure she say [sic] we talked on July 1st and. [sic]").  Powers did not actually end up contacting Williams, but he held onto the note and spoke with his attorney about it.

---

[8] Gov't Ex. #3550G.

Williams also testified at trial, corroborating Powers's testimony that Defendant needed her to lie on his behalf.  Williams testified that her first communication with Defendant on July 1, 2019, was not until 6:23 p.m., and she confirmed that she did not speak on the phone or have any other communication with him before that time.  At 6:23 p.m., she texted Defendant and asked him what he was doing.  Defendant stated he was headed to Olean, and Williams asked why he had not come to see his son before he left as he usually did before heading out of town.  Defendant replied at about 6:30 p.m.: "Because…watch the news."[9] Williams later watched the news and saw that someone had been killed on Freund Street.

In addition to the foregoing evidence concerning the murder, there was further corroborating evidence at trial in the form of physical evidence from the crime scene; phone records for Hay, Defendant, and Jalovick; excerpts from Facebook records for Hay, Defendant, and Jalovick; Google records associated with Defendant's, Hay's, and Jalovick's girlfriend's accounts; license-plate reader information for Hay's Chevy Impala; surveillance footage from Buffalo City cameras; historical cell site and location data information and analysis; and excerpts from a Cellebrite report for Defendant's iPhone.  The Government also presented evidence to support the drug conspiracy and firearms possession charges, which the Court need not outline here as those convictions are uncontested in the instant motion.

---

[9] Excerpts from Williams's phone records were entered into evidence, including the text communication with Defendant on July 1, 2019.  *See* Gov't. Ex. #190.

## DISCUSSION

Defendant argues the Government did not prove Counts 2 and 3, and 5 through 8, by legally sufficient evidence, and the guilty verdict was manifestly unjust.

## I.    Defendant's Rule 29 Motion

"Rule 29[, or a motion for a judgment of acquittal,] permits a trial court to set aside a jury's guilty verdict if it determines the evidence was 'insufficient to sustain a conviction.'"  *United States v. Greene*, 858 F. App'x 16, 17 (2d Cir. 2021) (summary order), quoting Fed. R. Crim. P. 29(a).  A defendant claiming that he was convicted based on insufficient evidence "bears a heavy burden."  *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (quotation omitted).  As stated previously, "[w]hen reviewing a challenge to the sufficiency of the evidence, [the district court] must view the evidence, whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in its favor."  *United States v. Kwong*, 14 F.3d 189, 193 (2d Cir. 1994).  A Rule 29 motion is granted only when evidence that the defendant committed the crime alleged "is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (quotations omitted).  "The evidence must be considered 'in its totality, not in isolation, and the government need not negate every theory of innocence.'"  *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (internal citation omitted).

While Defendant moves for a judgment of acquittal with respect to multiple counts of conviction, he does not specifically challenge the jury's guilty verdict on

Counts 1, 4, 9, or 10 in his written Rule 29 motion.  Thus, the Court does not address the latter counts.

### A.  Counts 2 and 3: Mere Presence

Defendant argues that the Government failed to present legally sufficient evidence to convict him on substantive Counts 2 and 3, as the Government's proof only established his mere presence at the scene of two controlled buys from Jalovick, which took place on April 23 and April 29, 2019, respectively.

Counts 2 and 3 each required the Government to prove that Defendant "distribute[d]…or possess[ed] with intent to…distribute…a controlled substance," that is, cocaine, on the dates in question.  21 U.S.C. § 841(a)(1).  The Court gave a combined instruction to the jury that it could not infer Defendant's guilt from either mere presence or mere association.  *See* 1 L. Sand, et al., *Modern Federal Jury Instructions—Criminal*, P 6.03, Instr. 6-3 & 6-4 (2025).

The two buys of small amounts of cocaine from Jalovick, who in April of 2019 was working as a confidential informant, were orchestrated by law enforcement to uncover the address of Hay, their target.  Hay testified at trial that he believed he was the individual who conducted both sales of cocaine with Jalovick: he alone communicated with Jalovick about the sales, set the terms of their agreement, and handled the cocaine and handed it to Jalovick.  Jalovick, however, made statements on May 2, 2019, which were admitted at trial,[10] to the effect that Defendant was

---

[10] These statements were admitted under the "forfeiture by wrongdoing" hearsay exception, Fed. R. Evid. 804(b)(6), *see* Dkt. No. 777 (text order), when Officer Acquino testified.

present during both cocaine transactions and Defendant conducted the second transaction at Hay's directive.  Furthermore, Powers testified at trial that Defendant told him he had distributed cocaine to the confidential informant, that is, Jalovick, during the second buy, because Hay gave the cocaine to Defendant to sell.  The jury was free to disbelieve Hay's testimony given over six years after the sales occurred that Hay alone conducted the cocaine sales with Jalovick and instead believe the statements by Jalovick and testimony by Powers that Defendant directly participated in the second drug transaction.[11]

Regardless of Hay's testimony concerning the two charged transactions, however, Hay testified extensively about his drug dealing activities with Defendant, and Hay's testimony about their drug trafficking activities together was corroborated by text messages, which confirmed the same.  Furthermore, testimony from other coconspirators established Defendant's involvement in such conspiracy.  Indeed, the Court gave the jury a *Pinkerton* charge on Counts 2 and 3, only, from which the jury could find Defendant guilty on a *Pinkerton* theory of liability.  *Pinkerton* provides that "a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement."  *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (internal citations omitted).  "Under the *Pinkerton* doctrine, 'a jury [may] find a

---

[11] An audio recording of the first undercover buy was entered into evidence as Government Exhibit 8, but in the Court's view, the audio quality was such that it did not show more than Defendant's mere presence at the scene.

defendant guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the defendant was a member of that conspiracy.'"  *United States v. Escobar*, 462 F. App'x 58, 66 (2d Cir. 2012) (summary order), quoting *United States v. Miley*, 513 F.2d 1191, 1208 (2d Cir. 1975); *see Pinkerton v. United States*, 328 U.S. 640, 645 (1946).

The jury convicted Defendant of the multidrug conspiracy charged in Count 1, which included cocaine and spanned in or before early 2016 and continued to on or about August 28, 2019.  The Court concludes the jury could have readily found under *Pinkerton* that Defendant was responsible for the drug sales charged in Counts 2 and 3, because they were committed during the course of, and in furtherance of, Hay's and Defendant's drug conspiracy—and evidence presented of that conspiracy was strong.  *See*, *e.g.*, *United States v. Howard*, Nos. 98-1430, 98-1472, 98-1534, 98-1618, 2000 U.S. App. LEXIS 13984, *17-18 (2d Cir. June 15, 2000) (summary order) ("[F]or some of the substantive offenses, there was in fact no evidence that the accused had directly committed the offense, apart from an aiding and abetting theory.  For example, there was no evidence that [one defendant] actually executed the sales at issue in [counts charging possession and distribution of crack cocaine]…Under these circumstances, the *Pinkerton* charge was appropriate."); *United States v. Mohamed*, 18-CR-00603 (ARR), 2020 U.S. Dist. LEXIS 153331, *26 (E.D.N.Y. Aug. 24, 2020) (internal citations omitted) ("A *Pinkerton* instruction is appropriate…particularly when there is less than overwhelming evidence that the defendant personally committed the substantive

offense."); *see also* 1 L. Sand, et al., *Modern Federal Jury Instructions—Criminal*, P 19.03, Instr. 19-13 (2025), Comment ("The court may charge on the theory whenever the proof of defendant's personal involvement in the commission of any substantive offenses is less than overwhelming").

### B. Counts 5 through 8: Premeditation Element

Defendant next challenges the jury's finding that he acted with premeditation when he killed Jalovick, which subjects him to sentencing enhancements on Counts 5 through 8.[12]  *See* 18 U.S.C. § 1111(b).

"[T]he salient distinction between first- and second-degree murder is the requisite *mens rea*."  *United States v. Cespedes*, 11-CR-1032 (PAE), 2015 U.S. Dist. LEXIS 99796, *3 (S.D.N.Y. July 30, 2015) (internal quotation marks and citation omitted).  First-degree murder under 18 U.S.C. § 1111 requires a "willful, deliberate, malicious, and premeditated killing," while second-degree murder is a general intent crime that requires "malice aforethought" but does not require premeditation.  *See United States v. Torres*, 629 F. Supp. 3d 86, 93-94 (S.D.N.Y. 2022).

The Court instructed the jury on the element of premeditation, with respect to Counts 5 through 8, and 10, as follows:

> An act is done with premeditation if it is done upon
> planning or deliberation.  In order to satisfy this element,
> the government must prove that the defendant killed
> [Joshua Jalovick] only after thinking the matter over,
> deliberating whether to act before committing the crime.
> There is no requirement that the government prove the

---

[12] Defendant continues to maintain that he did not shoot and kill Jalovick, and he makes these arguments in the alternative to his profession of innocence.  *See* Dkt. No. 1035-1, p. 9.  Notably, Defendant does not make this Rule 29 motion as to Count 10, although the same finding of premeditation was made by the jury on that count of conviction.

> defendant deliberated for any particular period of time in
> order to show premeditation.  The amount of time needed
> for premeditation of a killing depends on the person and
> the circumstances.  It is sufficient to satisfy this element if
> you find that before he acted, the defendant had a period
> of time to become fully aware of what he intended to do
> and to think it over before he acted.

2 L. Sand, et al., *Modern Federal Jury Instructions—Criminal*, P 41.01, Instr. 41-5 (2025); *see United States v. Morgan*, 22-2798, 2024 U.S. App. LEXIS 4181, *7 (2d Cir. Feb. 23, 2024) (summary order) ("Premeditation does not require the lapse of days or hours, or even minutes…Instead, it merely requires that a person with a cool mind reflect for at least a short period of time before his act of killing.") (internal quotation marks and citations omitted); *United States v. Gavalo*, 24-CR-80 (MKB), 2025 U.S. Dist. LEXIS 62366, *5 (E.D.N.Y. Apr. 1, 2025) ("What is important is not the amount of time that elapsed, but only that the defendant deliberates before committing the final act.") (collecting cases).  In addition, "[p]remeditation may be proved by circumstantial evidence including, but not limited to, the defendant's prior relationship to the victim, the defendant's carrying of the murder weapon to the scene, and the manner of the killing."  *United States v. Corbett*, 3:10-cr-28 (CFD), 2011 U.S. Dist. LEXIS 57679, *21 (D. Conn. May 31, 2011) (internal quotation marks and citations omitted).

As to malice, if the Government proved Defendant "acted consciously, with the intent to kill [Jalovick], [this would] satisf[y] the malice aforethought element." *Corbett*, 2011 U.S. Dist. LEXIS 57679, at *21.  The standard for malice "is usually expressed in terms that convey some heightened degree of disregard for human life… Judge Sand's model instruction recommends informing a jury that to

establish…malice…, the Government needs to prove 'reckless and wanton conduct on the part of a defendant which grossly deviated from a reasonable standard of care such that he was aware of the serious risk of death.'" *United States v. Velazquez*, 246 F.3d 204, 214 (2d Cir. 2001), quoting 2 Sand, P 41.01, at 41-13. "Usually, intent to kill is proven by circumstantial evidence… Courts in the Second Circuit have found specific intent to kill may be inferred where the defendant shoots multiple times or at close range." *Gavalo*, 2025 U.S. Dist. LEXIS 62366, at *4-7 (collecting cases). Cruel or brutal crimes also "raise an inference of malice." *United States v. Mulder*, 273 F.3d 91, 117 (2d Cir. 2001) (internal quotation marks and citations omitted).

Defendant contends that the proof at trial evinced only that he "act[ed] out of emotion, and not from planning," and that he was provoked to shoot "suddenly" by a dispute or altercation that occurred in the backyard, separate and apart from any plan with others. Thus, he reasons, the jury could not find that his shooting of Jalovick constituted first-degree murder.[13]

To the contrary, drawing all reasonable inferences in favor of the Government, the evidence at trial showed that Defendant acted with premeditation,

---

[13] Although Defendant does not directly contest the jury's finding of malice, it appears he may now be arguing the shooting was not murder, even murder in the second-degree. "[V]oluntary manslaughter requires *a mental state that would be malice except for heat of passion* or provocation[.]" *Velazquez*, 246 F.3d at 212 (internal quotation marks and citations omitted, emphasis in original); *see* 18 U.S.C. § 1112(a) (voluntary manslaughter is an unlawful killing, without malice, and "[u]pon a sudden quarrel or heat of passion"). In the event Defendant does advance this argument, as discussed briefly herein, the Court finds that the jury could easily conclude the killing of Jalovick was committed with malice.

and consciously, with a specific intent to kill Jalovick.  Powers's testimony regarding Defendant's admissions to him is, even standing alone, sufficient to establish Defendant's premeditation and malice.

Malice is apparent from the viciousness of the killing—in Defendant's shooting at Jalovick approximately eleven times, and at close range.  While no specific measurements were made of the backyard in which the killing occurred, Hay testified the backyard was small, and the jury could infer that Defendant was near Jalovick when Defendant shot at him.  The shooting was also brutal in the sense that it was conducted in daylight hours and in a yard full of people, and intent can be gleaned from the extensive damage to Jalovick's body.  Additionally, the trial evidence would allow the jury easily to conclude beyond a reasonable doubt that Defendant killed Jalovick with premeditation.  Hay testified at length about their planning and deliberate acts leading up to the murder.  The type of ammunition used by Defendant, as well as the prior attempts to kill Jalovick, also lend to the conclusion that Defendant mulled over killing Jalovick before he did so.

Defendant argues that Hay, Blackwell, Brooks, and Stevenson "all testified that the shooting was sudden and unexpected" and they all claimed to be "shocked" by it.  The defense also asserts these eyewitnesses "described [Defendant] acting out of emotion and not from planning."  There was some vague testimony that Defendant and Jalovick had gotten into an argument on July 1, 2019, perhaps earlier that day or at some point in the backyard, and Blackwell testified that Defendant was pacing in the yard and appeared mad about something before the shooting.  Regardless, there was plenty of other evidence for a rational jury to

conclude that Hay and Defendant planned out the shooting beforehand and Defendant reflected on the act before repeatedly pulling the trigger. For example, that Defendant "emptied the clip" could easily show his determination to kill Jalovick.

### C. Counts 5 through 8: Knowledge of Federal Involvement, and Nexus Requirement

Defendant argues the evidence at trial is insufficient to support his convictions on Counts 5 and 6, the obstruction-of-justice counts in the form of witness tampering, and Counts 7 and 8, the obstruction counts in the form of retaliation.[14] He argues there was no evidence at trial from which the jury could infer that Defendant killed Jalovick to prevent him from testifying in an "official proceeding" or to prevent him from communicating with a federal law enforcement officer, or that Defendant killed Jalovick to retaliate against him for providing information to a federal law enforcement officer.

For the purposes of Title 18, United States Code, Sections 1512 and 1513, an "official proceeding" includes "a proceeding before a judge or court of the United States…or a Federal grand jury," 18 U.S.C. § 1515(a)(1)(A), and the term "law enforcement officer" means "an officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government…authorized

---

[14] Count 5 charged Defendant with conspiring to murder Jalovick with the intent to prevent his attendance and testimony at an official proceeding, and to prevent him from communicating with federal officers about federal drug trafficking and firearms offenses. Count 6 charged Defendant with murdering Jalovick for the foregoing reasons. Count 7 charged Defendant with conspiring to retaliate against Jalovick for providing information to a federal law enforcement officer related to the commission and possible commission of federal drug trafficking and firearms offenses. Count 8 charged Defendant with retaliating against Jalovick for the same reasons.

under law to engage in or supervise the prevention, detection, investigation, or prosecution of an offense," 18 U.S.C. § 1515(a)(4)(A).  The obstructed proceeding "need not be pending or about to be instituted at the time of the offense," 18 U.S.C. § 1512(f)(1), but it must be "reasonably foreseeable to the defendant," *United States v. Pugh*, 945 F.3d 9, 21 (2d Cir. 2019) (quotation marks and citation omitted).

The defense misstates the law in arguing there is the following "requirement" for a defendant to violate 18 U.S.C. § 1512 and 18 U.S.C. § 1513: the defendant must have acted "because of *his belief* that he would be interfering with a *federal* prosecution[.]"  Dkt. No. 1035-1, p. 12 (emphases added).

Rather, pursuant to 18 U.S.C. § 1512, "[t]he prosecutor is not required to prove the defendant's state of mind with respect to the elements of the federal nature of the proceeding, the judge, agency, or law enforcement officer."  *United States v. Gonzalez*, 922 F.2d 1044, 1054 (2d Cir. 1991) (holding defendant's argument was meritless where he argued that the proof was insufficient where "there was no testimony that he was afraid [the confidential informant and murder victim] would 'rat him out' to the DEA—as opposed, for example, to some state or local law enforcement agency") (internal citations omitted); *see* 18 U.S.C. § 1512(g) (provision expressly providing that the Government is not required to prove that a defendant knew the federal nature of the official proceeding or the federal status of the law enforcement officer).

Likewise, the Second Circuit in *Escalera* held, "to convict under § 1513(b)(1) the Government is not required to prove that the defendant knew of the federal nature of the proceeding."  *United States v. Escalera*, 957 F.3d 122, 129 (2d Cir.

2020).  In other words, *Escalera* held that the Government need not prove defendant's knowledge of this "purely jurisdictional element" of § 1513; defendant's *mens* rea is "irrelevant" in this respect.  *Id.* at 134, 136.  In analyzing the text of the statute and its legislative history, the Circuit reasoned, "[t]hat the statute is limited to acts of retaliation for testimony at federal proceedings…does not necessarily require that the defendant *know* that the proceeding in question was federal."  *Id.* (emphasis in original).

The *Escalera* court suggested throughout its opinion that it would similarly conclude there is also no knowledge requirement regarding another provision of § 1513,[15] prohibiting retaliation for information about a federal offense provided to federal officers, such that it would hold no knowledge is required as to the federal status of a "law enforcement officer."  *See*, *e.g.*, *Escalera*, 957 F.3d at 129 n.8 (noting that "[n]o part" of a prior Second Circuit opinion held "that knowledge of federal involvement is a required element of an offense under 18 U.S.C. § 1513(b)(2)") and 137 ("It is a safe assumption that in the cases of numerous violent retaliations, it would be impossible to prove the defendant's knowledge that the proceedings *or the officers* were federal…It seems logical to assume that…Congress would have passed § 1513…with awareness of how problematic it would be for the enforcement of the statute if it were construed to require proof of knowledge that the proceedings *or officials* were federal") (emphases added).

---

[15] In *Escalera*, the charged provision was 18 U.S.C. § 1513(b)(2) (retaliation for communication, by bodily injury), whereas here, the almost identical statutory provision charged was 18 U.S.C. § 1513(a)(1)(B) (retaliation for communication, by killing).

Aside from this misstatement of the law regarding the jurisdictional element of the offenses of conviction, Defendant's position is that there was insufficient evidence to satisfy the nexus requirement of Section 1512. The Second Circuit has explained that Section 1512(c)(2) requires "a nexus between the defendant's conduct and the pending, or foreseeable, official proceeding." *Pugh*, 945 F.3d at 21 (quotation marks and citation omitted). "This is satisfied when 'the defendant's acts have a relationship in time, causation, or logic with the judicial proceedings,' meaning that the defendant's conduct 'must have the natural and probable effect of interfering with the due administration of justice.'" *United States v. Hilliard*, 23-6256, 2024 U.S. App. LEXIS 19304, *11 (2d Cir. Aug. 2, 2024) (summary order), quoting *Pugh*, 945 F.3d at 22. "[W]here a grand jury proceeding was foreseeable because the defendant was aware that he was the target of an investigation," for example, the Second Circuit has found the nexus requirement satisfied. *United States v. Binday*, 804 F.3d 558, 590 (2d Cir. 2015) (internal quotation marks and citations omitted).

The defense focuses on the proof that only Hay and Woodard were targeted by law enforcement, only Hay's and Woodard's houses were searched pursuant to search warrants obtained after Jalovick provided *in camera* testimony against them, and only Hay and Woodard were charged—by New York State—because of items seized during the searches. Thus, Defendant reasons, there was insufficient evidence to conclude Defendant believed he was or could be the target of a federal

investigation or that he foresaw the offenses enumerated in Counts 5 through 8 could be brought against him.[16]

What Defendant disregards, however—aside from the fact that he was Hay's drug trafficking coconspirator—is the evidence from which a reasonable jury could conclude, beyond a reasonable doubt, that Defendant killed Jalovick in retaliation for providing information to a federal law enforcement officer about Hay's federal drug trafficking and firearms offenses, or to prevent Jalovick from providing further information about Hay to a federal officer.

Hay testified that in 2019, Defendant was the individual he was closest to, and they saw each other about every other day. Furthermore, Hay explained that Defendant showed him a tattoo Defendant had that read, "MBK," meaning "My Brother's Keeper," along with Hay's nickname, "Gunner." Powers also testified that Defendant referred to Hay as his "brother" and it was apparent Defendant held him in high esteem. In Defendant's post-arrest interview, he told Agent Brostko that Hay was a "really close friend" of his and that he viewed Hay "like a big brother," which further confirmed he looked up to Hay. This proof, along with the proof that Hay and Defendant planned to murder Jalovick after learning he had passed along

---

[16] In each of Counts 5 through 8, the indictment charged that "the commission and possible commission of federal offenses" Defendant sought to prevent, or retaliated against Jalovick for providing information on, were "the distribution of controlled substances, in violation of Title 21, United States Code, section 841(a)(1) and conspiracy to do so, in violation of Title 21, United States Code, section 846; the unlawful possession of firearms in furtherance of drug trafficking, in violation of Title 18, United States Code, section 924(c)(1)(a)(i); the unlawful possession of firearms by a convicted felon, in violation of title 18, United States Code, section 922(g)(1); and the unlawful possession of a short-barreled rifle, in violation of Title 26, United States Code, section 5861(d)[.]"

information that led to the search warrants executed at Hay's and Woodard's houses, lends to the logical conclusion that Defendant had "the specific intent to retaliate against [Jalovick] for information [Jalovick] divulged to law enforcement authorities about a federal offense" (*United States v. Draper*, 553 F.3d 174, 180 (2d Cir. 2009)) committed by Hay—such as unlawful possession of firearms by a convicted felon or unlawful possession of a short-barreled rifle—and that Defendant intended to prevent Jalovick from passing along further information about a federal offense or offenses, or to prevent Jalovick from testifying in a foreseeable grand jury proceeding.

## II.     Defendant's Rule 33 Motion

"Upon [a] defendant's motion, [a] court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "In deciding a Rule 33 motion, the court 'must examine the entire case, take into account all facts and circumstances, and make an objective evaluation.'"  *Aguiar*, 737 F.3d at 264 (internal citation omitted).  "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice."  *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (quotations and citations omitted).  As such, a court may exercise its authority under Rule 33 only "'sparingly and in the most extraordinary circumstances.'"  *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992) (citation omitted).  "To grant [a] motion [for a new trial], '[t]here must be a real concern that an innocent person may have been convicted.'" *Aguiar*, 737 F.3d at 264 (citations omitted).

Defendant argues that purportedly erroneous evidentiary rulings by the Court, the Court's denial of a mistrial motion, and the Court's denial of his mid-trial motion

for a mental health assessment and treatment, justify a new trial.  The Court
concludes, instead, that it correctly decided each of the challenged evidentiary
rulings and defense motions, and there was overwhelming evidence supporting
Defendant's convictions.

### A.    Evidentiary Rulings

 "Even if certain evidence is improperly admitted…reversal is warranted only if
an error affects a 'substantial right,' Fed. R. Evid. 103(a)—that is, if the error had a
substantial and injurious effect or influence on the jury's verdict."  *United States v.*
*Bout*, 651 F. App'x 62, 63 (2d Cir. 2016) (summary order) (internal quotation marks
and citation omitted); *see United States v. Soto*, 12-CR-556 (RPP), 2014 U.S. Dist.
LEXIS 60191, *13 (S.D.N.Y. Apr. 28, 2014) ("Where an evidentiary ruling is the
basis of a defendant's Rule 33 motion, the question is not whether there was error in
the evidentiary ruling, but whether there is 'manifest injustice' and a real concern
that an innocent person may have been convicted.").

<u>*Limitations on Cross-Examination and Method of Impeachment*</u>

Defendant argues he is entitled to a new trial because this Court improperly
limited defense counsel's cross-examination of certain prosecution witnesses.  It is
well-settled that "[a] district court is accorded broad discretion in controlling the
scope and extent of cross-examination[.]"  *United States v. Wilkerson*, 361 F.3d 717,
734 (2d Cir. 2004) (internal quotation marks and citations omitted); *see* Fed. R. Evid.
611(b).  "A trial judge does not abuse his discretion by curtailing cross-examination
as long as the jury has sufficient information to make a discriminating appraisal of
the particular witness's possible motives for testifying falsely in favor of the

government." *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990) (internal quotation marks and citation omitted).

First, Defendant argues the Court abused its discretion in disallowing defense counsel from impeaching several witnesses with video recordings of interviews with law enforcement that were not transcribed. Defendant further argues that when the defense did obtain transcripts of these interviews, impeachment by transcript was "not as effective" or impactful as impeachment using the video recordings would have been.

Partway through trial, the Court ordered that moving forward any recording used for refreshing a witness's recollection or for impeachment purposes would have to be accompanied by a prepared transcript (or transcripts, should the opposing party contest the accuracy of the prepared transcript). It did so partly because the audio quality on the recordings used up to that point was so poor. In addition, the defense method of playing portions of recorded interviews in front of the jury was wholly improper as the jury would inevitably hear inadmissible evidence,[17] and the alternative method of sending the jury out of the Courtroom every time a witness was confronted with a recorded interview would waste time and cause significant delay. *See* Fed. R. Evid. 611(a). Although Defendant had "the right to attempt to impeach" the Government's witnesses, he "did not have the right to do so by whatever method [the defense] chose." *United States v. Yurofsky*, 55 F.

---

[17] For example, if the defense was attempting to refresh a witness's recollection with an audio recording, should the witness state the recording did not refresh his or her recollection, the jury would have already heard the portion of the recording played for the witness, nevertheless.

App'x 13, 15 (2d Cir. 2002) (summary order).  "[T]he Confrontation Clause

guarantees an *opportunity* for effective cross-examination, not cross-examination

that is effective in whatever way, and to whatever extent, the defense might wish."

*Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam) (emphasis in original).

In imposing these restrictions on cross-examination, the Court was merely

exercising its "'broad discretion in passing upon appropriate trial procedures.'"

*United States v. Massino*, 296 F. App'x 131, 133 (2d Cir. 2008) (summary order),

quoting *United States v. Lombardozzi*, 335 F.2d 414, 417 (2d Cir. 1964).

Additionally, many of the defense attempts to use recordings of interviews

were without any evidentiary basis, and simply to support the defense theory at trial.

The theory was that the prosecution's cooperating witnesses who were present in

the backyard at the time of the murder were all lying about Defendant killing

Jalovick, and they were testifying only in accordance with the "narrative" or "theory"

the Government conveyed to them during their custodial interviews.  The defense

sought to support this argument by playing recordings of Agent Brostko's interviews

with Blackwell and Brooks, for example, to show the alleged "misleading" and

"improper" methods employed by officers in those interviews.  In any event,

Defendant's attorneys "exhaustively attacked" the credibility of Blackwell, Brooks,

and Stevenson "during cross-examination and on summation."  *United States v.*

*Gordils*, 982 F.2d 64, 72 (2d Cir. 1992).  Defendant's counsel probed deeply into

matters affecting these witnesses' credibility and subjected them to vigorous cross-

examination on their possible motives to testify falsely.  They were asked about their

criminal history, the differences between the witnesses' trial testimony and their

testimony before the grand jury, the benefits they might hope to gain by cooperating with the Government, and their ability to observe and remember the perpetrators of the murder.

Second, during the cross-examination of Agent Brostko, the Government's case agent, the Government objected to questions posed by the defense regarding two search warrant affidavits signed by Agent Brostko in support of search warrant applications from 2019,[18] which referenced an interview that Andre Hall, Stevenson's uncle, had with BPD Lieutenant Lucia Esquilin (formerly BPD Detective Lucia Schultz) and "other law enforcement officers" on July 4, 2019.  In that July 4, 2019, interview, Hall told law enforcement that Stevenson had revealed details of the murder to him, including that Stevenson was at 87 Freund Street at the time of the murder, "it didn't go as planned," and there were two shooters and "Franklin Gambino" (believed to be Hay) "finished him off."  The Government objected when the defense began to ask Agent Brostko whether information contained in these search warrant affidavits was consistent with information in Agent Brostko's Report of Investigation ("ROI") from a proffer interview with Hall on August 12, 2019,[19] in which it was noted that Hall conveyed to Agent Brotsko that (a) Stevenson told Hall there were two shooters; and (b) Stevenson told Hall the first shooter was a light-skinned black male, and Stevenson showed Hall a Facebook photograph of such person.  The ROI also noted that when Agent Brostko showed Hall what he believed

---

[18] *See* Gov't Ex. #3509R-014, -015; Gov't Ex. #3509S-026, -027.

[19] *See* Gov't Ex. #3526B.

to be Hay's Facebook page, under the name "Franklin Gambino," Hall stated the photograph Agent Brostko was showing him was the exact same photograph Stevenson had shown him when Stevenson described the first shooter.

The Court sustained the Government's objection after first receiving written briefs from the parties (Dkt. Nos. 981, 986) and hearing oral argument on the issue. However, the Court ordered the Government to make Hall available as a defense witness and stated the Government should be able to do as Hall had taken a plea in this District pursuant to a plea agreement that had a cooperation provision. Hall was still under the terms of the cooperation provision at the time of Defendant's trial, having completed the incarceration portion of his sentence but serving his term of supervised release under courtesy supervision by the U.S. Probation Office in the Northern District of Georgia. The Government did facilitate Hall's presence at trial as a defense witness.

The defense claims that they were impeaching Agent Brostko with his prior inconsistent statements under Federal Rule of Evidence 613(b), and that the statements were not being offered for their truth but to show that the statements made in the search warrant affidavits were false and "misrepresent[ed]" the information Hall conveyed to Agent Brostko—that is, misrepresented the statements made by Stevenson to Hall, which, in turn, were then conveyed to Agent Brostko.[20] This line of questioning was not permitted by the Court for several reasons.

---

[20] Notably, the defense never filed a motion for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), with respect to the veracity of statements in Agent Brostko's search warrant affidavits. Instead, the defense claimed during Agent Brostko's testimony at trial

Cross-examination of any witness, even a case agent involved in the investigation of a defendant, is limited to "the subject matter of the direct examination and matters affecting the witness's credibility." Fed. R. Evid. 611(b). The defense's inquiry about Hall's statements went beyond the scope of Agent Brostko's direct examination. Agent Brostko did not testify on direct examination about the substance of Hall's proffer or Hall's interview; there was no trial testimony by Agent Brostko for the defense to impeach. *See United States v. Solla*, 19-CR-740 (CM), 2021 U.S. Dist. LEXIS 231676, *18 (S.D.N.Y. Dec. 2, 2021) ("The fact that [a] witness is a law enforcement agent who had wide involvement in an investigation of the defendant does not expand the scope of permissible cross-examination.") (collecting cases); *see also United States v. Adeniyi*, 3-CR-86 (LTS), 2004 U.S. Dist. LEXIS 8490, *9 (S.D.N.Y. May 12, 2004) ("Contrary to Defendant's assertion, [the case agent] did not testify on direct examination about any prior conversations he had engaged in with other witnesses who testified at trial. The Court is also unpersuaded by Defendant's apparent contention that [the case agent]'s acknowledgment during direct examination that he had participated in an investigation of Defendant, coupled with [the case agent]'s testimony regarding certain specific aspects of that investigation, combined to give defense counsel carte blanche to inquire into any subject related to the investigation of Defendant.").

In addition, the defense was improperly relying on Rule 613(b) in pursuing this series of questions. Rule 613(b) permits the admission of extrinsic evidence of *a*

---

that its anticipated line of cross-examination would reveal that his affidavits contained false statements.

*witness's* prior inconsistent statement for purposes of impeachment, "if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it."  Fed. R. Evid. 613(b). Critically, "Rule 613(b) applies to [ ] witnesses' prior inconsistent statements—not testimony [or statements] by an entirely different witness that conflicts with the witnesses' version of events."  *United States v. Wilson*, 1:19-CR-00155 EAW, 2022 U.S. Dist. LEXIS 210637, *23 (W.D.N.Y. Nov. 21, 2022), *aff'd*, No. 23-6307-cr, 2025 U.S. App. LEXIS 14890 (2d Cir. June 17, 2025).  In *Adeniyi*, for example, the defendant argued that the questions the Court cut him off from asking were designed to simply attack a case agent's credibility "by demonstrating that his prior Grand jury testimony was inconsistent with the testimony of other witnesses at trial who he had interviewed during the course of the investigation."  *Adeniyi*, 2004 U.S. Dist. LEXIS 8490, at *10.  The Court held that the cited principle of impeaching the credibility of a witness by his prior inconsistent statements was "inapposite," though, because such principle "relates only to prior statements made by a witness that are inconsistent with statements made by the same witness during trial."  *Id.*

The statements at issue also contained multiple levels of hearsay.  "Each hearsay statement within multiple hearsay statements must have a hearsay exception in order to be admissible."  *United States v. Cruz*, 894 F.2d 41, 44 (2d Cir. 1990), citing Fed. R. Evid. 805.  As the Government noted, the relevant information in the search warrant affidavits derived from an interview in which Agent Brostko did not participate.  Indeed, Agent Brostko explained on cross-examination that

32

statements made in the search warrant affidavits were based upon statements made by Hall to Detective Schultz, not to Agent Brostko.

Moreover, had the Court permitted Agent Brostko to be questioned in this fashion, that would have been misleading and invited confusion for the jury, and resulted in a mini-trial centered on whether Agent Brotsko intentionally misrepresented any fact in the search warrant affidavits or his ROI. Rather than focusing on the material issues at hand, the jury would have been led to examine each step of Agent Brostko's investigation and place the Government on trial. Under Federal Rule of Evidence 403, evidence of any inconsistency between Agent Brostko's ROI and the two affidavits had minimal probative value, particularly considering the information in the affidavits was not derived from the information in the ROI. *See United States v. Rivera*, 273 F. App'x 55, 58 (2d Cir. 2008) ("A witness may be impeached by extrinsic proof of a prior inconsistent statement only as to matters which are not collateral…") (internal quotation marks omitted).

In sum, nothing about the scope or mode of these witnesses' cross-examinations affords grounds for a new trial.

<u>Limitation of Defendant's Impeachment of Daeshawn Stevenson and Eric Brooks, through Defense Witnesses Andre Hall and Lenae Williams</u>

Defendant called two witnesses at trial to impeach two eyewitnesses to Jalovick's murder who had testified in the prosecution's case, with what the defense asserted were prior inconsistent oral statements, admissible pursuant to Rule 613(b). Hall was called by Defendant to testify regarding statements made to Hall by Stevenson following the murder, and Lenae Williams, the mother of Brooks's

child, was called to testify regarding statements made to Williams by Brooks following the murder.[21]  The parties submitted briefs (Dkt. Nos. 972, 979) regarding the statements the defense sought to question Hall and Williams about, and the Court heard argument the morning these witnesses were called.

Prior inconsistent statements offered for impeachment are not hearsay because they are not offered for their truth, but instead to demonstrate the witness's lack of credibility.  *See United States v. Mergen*, 764 F.3d 199, 206 and n.3 (2d Cir. 2014).  As stated above, "[a] witness's prior statement may be offered to impeach that witness's credibility if (1) the statement is inconsistent with the witness's trial testimony, (2) the witness is afforded an opportunity to deny or explain the same, and (3) the opposing party is afforded the opportunity to cross-examine the witness thereon."  *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995), citing Fed. R. Evid. 613(b).  "[T]he determination of whether statements are in fact inconsistent is committed to the sound discretion of the district court…and statements need not be diametrically opposed to be inconsistent[.]"  *United States v. Agajanian*, 852 F.2d 56, (2d Cir. 1988) (internal quotation marks and citations omitted); *see United States v. Trzaska*, 111 F.3d 1019, 1025 (2d Cir.1997) (in deciding if the proffered statement is inconsistent with the testimony sought to be impeached, the test is whether "there is '[a]ny variance between the statement and the testimony that has a *reasonable bearing on credibility*'") (citation omitted, emphasis in original).  Even if all these requirements are met, the trial court nevertheless may exclude the extrinsic

---

[21] In the instant section of this Decision and Order, "Williams" refers to Lenae Williams, not La'Trise Williams, *see supra*, p. 10.

evidence under Rule 403 if it is determined that its "probative value is substantially outweighed by…unfair prejudice."

The Court followed the above-referenced standards in its determination on what testimony it would permit Defendant to elicit from Hall and Williams.  It also took note of the general principles set forth in *United States v. Ghailani*, 761 F. Supp. 2d 114, 117-119 (S.D.N.Y. 2010).  The Court permitted Defendant to question the defense witnesses on statements the Government conceded Defendant could ask them about (*see* Dkt. No. 979, § II-C, D, & H [conceded, with a caveat]).  As to the remaining statements (*see* Dkt. No. 979, § II-A, B, F, & G) Defendant sought to ask Hall and Williams about, the Court either did or did not permit questioning in those areas after examining if the statements were inconsistent with Stevenson's and Brooks's trial testimony; if Stevenson and Brooks were afforded an opportunity to deny or explain said statements,[22] and if the Government had an opportunity to question them about this; if impeachment by the prior inconsistent statement related to a material rather than a collateral matter; and even assuming all the requirements

---

[22] In some instances, as argued by the Government, the defense did not sufficiently confront Stevenson and Brooks with the alleged inconsistent statements, because the defense did not attempt to refresh their recollection regarding the purported statements. *See*, *e.g.*, *United States v. Amato*, 03-CR-1382 (NGG), 2006 U.S. Dist. LEXIS 43366, *15-16 (E.D.N.Y. June 27, 2006) ("It [was]…unclear from the entire cross-examination whether [defendant] [was] impeaching [the witness] based on extrinsic evidence of inconsistent statements, or simply probing [the witness's] recollection of the events in question to elicit contradictions in [the witness's] testimony.  Furthermore, [defendant]'s counsel never confronted [the witness] with the purported evidence of the inconsistent statement(s)…[T]his court is constrained to conclude that [defendant] did not provide [the witness] with sufficient opportunity to explain or deny the prior inconsistent statement.").

for such impeachment were satisfied, if the extrinsic evidence should nevertheless be excluded under Rule 403.

Additionally, because "prior inconsistent statements…can be used only for impeachment," *United States v. Briggs*, 457 F.2d 908, 910 (2d Cir. 1972), the Court read a limiting instruction to the jury to this effect following the testimony of Williams and Hall and modified from the pattern instruction on impeachment by prior inconsistent statement.  *See* 1 L. Sand, et al., *Modern Federal Jury Instructions— Criminal*, P 7.01, Instr. 7-19 (2025).

The Court also ruled that while certain statements made by Stevenson to Hall, and by Brooks to Williams, could be admitted for impeachment purposes, such statements were inadmissible for the truth of the matter asserted because the defense failed to lay a sufficient foundation for admissibility of the statements under any exception to the rule against hearsay.

## *Admission of Evidence from Defendant's Cell Phone*

Defendant argues the Court should have excluded admission of any evidence obtained or derived from the contents of his cell phone, because (1) the phone was seized and searched in violation of his Fourth Amendment rights, (2) the Government failed to sufficiently authenticate the extraction of data and information from the phone, and (3) the Government did not produce certain Rule 16 discovery.

During the pretrial phase of the case, a suppression hearing was held before Magistrate Judge Michael J. Roemer, who issued a Report, Recommendation and Order ("RR&O," at Dkt. No. 345) recommending that this Court deny Defendant's motion to suppress evidence from Defendant's cell phone, a motion made on the

ground that the warrantless seizure of his phone on August 20, 2019, at his mother's residence in Pensacola, violated his Fourth Amendment rights. On January 10, 2023, the Court issued a Decision and Order denying Defendant's motion to suppress, and adopting the RR&O. *See* Dkt. No. 447, pp. 3-5. At trial, the Court denied the defense's renewed objection to the introduction of evidence from Defendant's cell phone, based on his argument that law enforcement's seizure of the phone was unlawful. The Court again sees no reason to revisit that ruling.

Defense counsel also repeatedly objected during trial to the admission of evidence from Defendant's cell phone, maintaining the Government failed adequately to authenticate the evidence. This objection was raised for the first time weeks into the trial, on May 30, 2025, during the beginning of the Government's direct examination of one of its experts, ATF Special Agent and Digital Forensics Examiner Justin Schaefer, who used Cellebrite to perform a forensic analysis of Defendant's phone.

When Defendant's cell phone was seized by ATF, it was broken and required repairs to make it operational. The repairs were performed by a third-party external vendor on October 24, 2019,[23] prior to the completion of ATF's "GreyKey" extraction of data from the phone and subsequent generation of a Cellebrite report to convert the extracted data into a readable format. The first page of the Cellebrite report,[24] generated on September 29, 2023, included a table labeled "Device Information,"

---

[23] *See* Def. Ex. #H (repairs receipt); Dkt. No. 965-2, p. 2.

[24] *See* Gov't Ex. #186H, p. 1; Dkt. No. 965-3, p. 2.

which stated, in pertinent part: "Tethering" – "Last Hotspot Activity" – "2020-04-06"
(April 6, 2020) – 19:25:42 (19 hours, 25 minutes, and 42 seconds). This "[t]ethering"
occurred approximately two months before the GreyKey extraction was completed in
June of 2020.

Defendant now argues that the Government should have been required to lay
a "full digital chain of custody foundation" (Dkt. No. 965, p. 1) for the offered contents
of his cell phone, and that "serious" gaps in the chain of custody render the evidence
inadmissible. In particular, he argues that, first, it is unclear whether the "forensic
integrity" of his cell phone was maintained during the third-party external repair
process (Dkt. No. 965, p. 3); and second, the notation of "Tethering" indicates his
cell phone was connected to an external computer, network, Wi-Fi, or the Internet on
April 4, 2020, during which the digital data on his cell phone "could have been
altered, deleted, or tampered with" (Dkt. No. 1035-1, p. 29).

As the Court already determined upon its review of the parties' briefing on this
issue (*see* Dkt. Nos. 953, 965, 966), any weakness in the chain of custody and
questions about the authenticity of this evidence went to its weight and not its
admissibility.

Federal Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of
authenticating or identifying an item of evidence, the proponent must produce
evidence sufficient to support a finding that the item is what the proponent claims it
is." As the Second Circuit explained, "Rule 901 does not erect a particularly
high hurdle, and the proponent of the evidence is not required to rule out all
possibilities inconsistent with authenticity, or to prove beyond any doubt that the

evidence is what it purports to be." *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001) (internal quotation marks and citations omitted). Rather, "Rule 901 is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *United States v. Gonzalez*, 144 F.4th 396, 406 (2d Cir. 2025) (internal quotation marks and citation omitted). That proof "may be direct or circumstantial." *United States v. Al-Moayad*, 545 F.3d 139, 172 (2d Cir. 2008) (internal citations omitted). Once a prima facie showing of authenticity is met by the proponent of the evidence, the ultimate reliability of the evidence becomes a question for the jury and "the opposing party remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight, not the admissibility, of the evidence." *Gonzalez*, 144 F.4th at 406.

Defendant argues that there "may" have been a "major compromise of the digital chain of custody and the forensic integrity of the GreyKey extraction" (Dkt. No. 1035-1, p. 29), because the data on the phone could have been tampered with before the completion of the GreyKey extraction, when it was repaired by a third-party vendor and/or when it was "[t]ethered" to another network. But Agent Schaefer testified that whenever repairs were performed by an outside vendor, ATF policy/procedure was to be present during the repair process. He also explained that the "Tethering" notation meant the phone was simply *attempting to search* for an external connection or input signal, but this did not mean the phone was, in fact, connected externally. Agent Schaefer had no concerns that there was corruption of data in this case, as it did not appear the phone actually connected to a network.

There was no evidence that the physical or digital evidence on the cell phone was manipulated or tampered with, and Defendant's assertions amount to sheer speculation. *See*, *e.g.*, *Bout*, 651 F. App'x at 64 ("[Defendant]'s pure speculation that this drive could possibly have been tampered with during short breaks in the chain of custody might have created a sliver of doubt as to its authenticity, but the government is not required to 'rule out all possibilities inconsistent with authenticity.'") (internal citation omitted); *United States v. Landji*, 18-CR-601 (PGG), 2022 U.S. Dist. LEXIS 113679, *64, 67 (S.D.N.Y. June 27, 2022) ("[Defendant] has never argued that any of the cell phone extractions admitted at trial were actually altered…There is no evidence that the evidence derived from the Defendants' cell phones were altered or manipulated in any way.").[25]

Moreover, the defense was permitted to ask questions on cross-examination of both Agent Schaefer and retired Program Manager at the Digital Forensics Branch of ATF, David Good, the latter who was called by the Government as a courtesy to the defense, "related to the alleged tampering and to argue to the jury that the [data on the cell phone] may have been incomplete [or altered]." *United States v. Sovie*, 122 F.3d 122, 127 (2d Cir. 1997).

---

[25] The out-of-Circuit case law Defendant relies upon regarding tampering with digital evidence is readily distinguishable. *See United States v. Hock Chee Koo*, 770 F. Supp. 2d 1115, 1124-26 (D. Or. 2011) (precluding the Government from offering an image of defendant's laptop as evidence of what was on the laptop before his former employer obtained it, because there was "unrebutted expert testimony" that the data could not be identical to that previously on the laptop—the employer had "accessed the laptop" and "deleted or changed content," and additionally, a computer analyst the employer had hired to examine the laptop "unknowingly affected the integrity of the laptop").

It also bears noting that "[e]stablishing a chain of custody is but one way of providing [ ] authentication," *United States v. Thomas*, 54 F.3d 73, 82 (2d Cir. 1995), and even for authentication by chain of custody, "[b]reaks in the chain of custody do not bear upon the admissibility of evidence, only the weight of the evidence," *United States v. Morrison*, 153 F.3d 34, 57 (2d Cir. 1998).  Other means of authentication can include testimony from a witness with knowledge "that an item is what it is claimed to be," Fed. R. Evid. 901(b)(1), or "by distinctive characteristics of the [item] itself, such as… 'appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances,'" *Gonzalez*, 144 F.4th at 406, quoting Fed. R. Evid. 901(b)(4).

The Government authenticated the cell phone evidence in a variety of ways (*see* Dkt. No. 953), including through matching the unique identifiers on the cell phone with those on the Cellebrite report; the testimony of witnesses who authenticated, for example, text message exchanges with Defendant located on such cell phone; and the unique characteristics of the phone's contents, such as photographs of Defendant, photographs of Defendant and his young son, and emails directly linked to Defendant.  The foregoing is the sort of proof the Second Circuit has held is sufficient to lay a foundation for the admission of cell phone evidence.  *See*, *e.g.*, *Gonzalez*, 144 F.4th at 406 (among other proof, an analyst "testified that the International Mobile Equipment Identity (IMEI) numbers, a unique numeric identifier found on cellphones, linked to the defendants' cell phones and matched the IMEI numbers found on the extraction report"); *United States v. Balouchzehi*, No. 23-7609-cr, 2024 U.S. App. LEXIS 27255, *4-6 (2d Cir. Oct. 28,

2024) (summary order) ("This evidence was sufficient to show that the phone belonged to [defendant] and that the extraction report and accompanying exhibits were derived from the contents of [defendant]'s phone."); *see also Landji*, 2022 U.S. Dist. LEXIS 113679, at *67 ("There was ample evidence that the cell phones belonged to the Defendants, and that the extraction reports reflect data that was stored on the Defendants' cell phones.").

The data and other evidence derived from Defendant's cell phone was properly admitted, as there was sufficient proof to establish its authenticity.

Last, Defendant argues that the Government failed to comply with its disclosure obligations under Federal Rule of Criminal Procedure 16(a)(1)(F) and 16(a)(1)(G)(iii). Defense counsel asserts that certain documentation and reports related to the repair of Defendant's phone and the GreyKey extraction were not turned over, and if Defendant had been provided with this documentation the defense could have moved to suppress the entirety of the data extraction. Defendant counsel also argues that the Government failed to comply with its expert disclosure requirements with respect to Agent Good.

The Court agrees with the Government that there was no violation of Rule 16. As stated in Court, the Government did not plan to call Agent Good to testify. Indeed, in the Government's witness list, Agent Good was listed as a potential "chain-of-custody" witness who, "[i]f necessary," would be called to testify about Defendant's cell phone.[26] Unlike Agent Schaefer, Agent Good was not included in

---

[26] *See* Dkt. No. 928, ¶32.

the Government's expert disclosure. The defense first indicated, weeks into the trial and on the morning of June 5, 2025, that it would potentially seek to call Agent Good as part of Defendant's case, and the Court ordered the Government to make Agent Good available to the defense. That same afternoon, the lead AUSA stated that Agent Good would be available the following morning to the defense, but the defense attorneys stated they took issue with calling Agent Good before the Government had rested. On June 10, 2025, the lead AUSA updated the Court that because of Agent Good's future unavailability, he had to testify that day and therefore the Government would be calling him as part of its direct case as a courtesy or convenience to the defense.[27] The Government then asked Agent Good very limited questions on direct examination. For the defense to now complain there was a lack of expert notice and disclosure, which thereby caused Defendant "substantial prejudice" and warrants a new trial (*see United States v. Vinas*, 910 F.3d 52, 60-61 (2d Cir. 2018)), is disingenuous.

## *Admission of Redacted Version of Defendant's Post-Arrest Interview and Preclusion of Admission of Self-Serving Hearsay*

At trial, the Government moved into evidence under Federal Rule of Criminal Procedure 801(d)(2)(A) a redacted version of Defendant's August 20, 2019, custodial interview.[28] This evidence was admitted over the defense's renewed objection that the Government should not be permitted to play only select portions of

---

[27] At that juncture the Government had already presented authentication evidence regarding the cell phone's contents.

[28] *See* Gov't Ex. ## 162A-E, H-S, and U-Z (video clips of interview).

the interview to the jury.  In his Rule 33 motion, Defendant rehashes the same rule-of-completeness arguments the Court considered and rejected in a comprehensive Decision and Order (Dkt. No. 903) rendered before trial.  The Court will not restate its rationale for its ruling, but it does note that Defendant was nevertheless able to advance his theory at trial about why he made certain statements during the interview.[29]  Indeed, some of Defendant's denials of criminal activity were included in the version of the interview submitted to the jury, and the defense also cross-examined law enforcement agents about their interview techniques.

### B.    Mistrial Motion

In his Rule 33 motion, Defendant argues that the Court erred in denying his motion for a mistrial, thereby depriving him of a fair trial.  The Court denied from the bench Defendant's motion (Dkt. No. 939), which was predicated on alleged prosecutorial misconduct that occurred during the Government's direct examination of Kurt "Anzo" Welch, when an AUSA, outside the presence of the jury but in the presence of the witness, accused Welch of lying.  The defense argued this alleged misconduct would inevitably result in a violation of Defendant's due process and confrontation rights to freely cross-examine Welch and mount a defense.  For the reasons previously stated (Dkt. No. 948) and those that follow, the Court concludes it properly exercised its discretion in denying the motion and finding that Defendant

---

[29] Defendant's theory was that his "steadfast denials of drug dealing, possession of firearms, and shooting Jalovick—while he was subject to the same interview techniques used by the agents in obtaining his reversal concerning his whereabouts on July 1, 2019—suggests that Defendant's denials were truthful and undermines the inference that Defendant's recantation [of denying he was present at 87 Freund Street on the date of the murder] demonstrates a consciousness of guilt."  Dkt. No. 903 (D&O), pp. 11-12.

did not establish the three elements required for him "[t]o demonstrate a due process violation based on the government's intimidation of [a] witness[ ]…(1) 'that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means,' (2) 'bad faith on the part of the government,' and (3) that 'the absence of fundamental fairness infected the trial.'" *United States v. Lebedev*, 932 F.3d 40, 55 (2d Cir. 2018) (internal quotation marks and citation omitted), *abrogated on other grounds*, *Ciminelli v. United States*, 598 U.S. 306 (2023) (internal citation omitted).

The Court explained in the Decision and Order at Docket Number 948, which was issued <u>before</u> Welch was recalled as a witness for completion of his direct examination and for the defense to cross-examine him:

> Initially, Defendant has not shown that the AUSA's encounter with Welch deprived Defendant of material and exculpatory evidence. In fact, both the text message evidence in the record and the testimony of Welch himself, presently before the jury, suggest that Welch did <u>not</u> return a gun to Defendant until <u>after</u> the murder[30]…Since cross-examination had not yet occurred at the time the defense made the instant mistrial motion, it remains to be seen whether and to what extent—if at all—the conduct of the prosecutor may inhibit Defendant's ability to cross-examine or test the credibility of the witness.

---

[30] During Welch's direct examination, the Government had sought to show that a gun Welch had borrowed from Defendant in the summer of 2019 was returned to Defendant on June 30, 2019, just one day before Jalovick's murder, to argue it was one of the two guns used in the shooting. It also sought to have Welch clarify that a text message from Defendant to Welch on July 6, 2019, "I'm really gon [sic] come grab that bra [sic] Everytime I get ready to something come [sic] up feel me [sic]," was in reference to over 30 bullets Defendant wanted to obtain from Welch, and not the gun in question. Welch made a prior statement to a federal agent, to this effect—that he had returned the gun to Defendant before the murder, and the text message from July 6, 2019, was not in reference to a delayed pick-up of the gun but instead referred to ammunition.

[…]

      Here, and although the Court is, at this point, forced to make such a determination prospectively, Defendant does not show that the single incident at issue, relatively early in the trial, has infected the entirety of the trial or caused an absence of fundamental fairness…both Welch's testimony thus far as well as the text messages in evidence indicate—in apparent contradiction of Welch's prior statement made to a federal agent—that he gave the gun back to Defendant <u>after</u> the murder charged in this case.  As such, it cannot be said that he has been deprived of any material or exculpatory evidence…

…The Government's witness list includes the names of numerous eyewitnesses, as well as cooperating codefendants who the Government expects will testify about Defendant's involvement in the murder.  In view of the breadth and scope of the anticipated evidence that will be introduced in this case, the isolated remark involving a witness who does not directly implicate Defendant in the shooting—from the prospective point of view from which this Court must exercise its discretion—mitigates any prejudice occasioned by the conduct of the prosecutor in this case.  Should the proof in this case fall short of that which is anticipated by the Government, however, the Court will revisit this issue at the conclusion of the Government's case.

Dkt. No. 948, pp. 8, 12-13 (emphases in original).

      When Welch was recalled, he had been assigned and he had spoken with an attorney, and the Government had granted him informal immunity.  On cross-examination, the defense elicited these facts, as well as the circumstances that led to Welch being assigned an attorney and conferred immunity, that is, the AUSA's alleged misconduct.  Welch explained that he had not been lying during direct examination; rather, he had been under pressure when testifying, and when he had spoken with law enforcement.

Regarding the gun Welch had borrowed from Defendant, Welch explained on cross-examination that he had asked Defendant to loan him a gun as a favor, because Welch did not feel safe in his own neighborhood.  When the threats in his neighborhood subsided, Welch sought to deliver the gun to Defendant or to have Defendant come pick it up, efforts that did not initially pan out because the police were looking for Welch; Defendant was out-of-town in Olean; and Defendant's cousin failed to pick up the gun for Defendant.  The text message from Defendant to Welch on July 6, 2019, five days after Jalovick's murder, according to Welch meant that while Welch had made previous efforts to facilitate returning the gun to Defendant, those efforts had not worked out.

On cross-examination, then, the defense not only probed into the circumstances of the alleged prosecutorial misconduct, such that the jury was aware of those events, but Welch also adhered to what he had testified to on direct: that he did not return the gun he borrowed from Defendant until <u>after</u> the murder.  Even assuming, *arguendo*, a showing of prosecutorial bad faith, which the Court did not find here, the defense surely failed to establish the other two prongs of the test for a due process violation.  The testimony by Welch on cross-examination was unquestionably favorable to the defense and comported with a plain reading of the text message evidence.[31]  Welch's testimony also aligned with Hay's later testimony

---

[31] Indeed, at oral argument on the mistrial motion, the defense did not seek to strike Welch's testimony on direct examination as was proposed by the Court, because the defense acknowledged Welch's testimony was exculpatory.  Rather, the defense was concerned that Welch might change his testimony when he was recalled, simply because of the alleged coercion/threat by the Government.  Notwithstanding such concerns, Welch did <u>not</u> change his testimony.

during the trial that Welch did not provide the guns used to shoot Jalovick.  It cannot

be said under these circumstances that the AUSA's remarks "so infected the trial

with unfairness" as to render Defendant's conviction "a denial of due process."  *See*

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Now that the Court can assess

the Government's proof retrospectively, even absent the statements by the AUSA

and considering the breadth and strength of the Government's case, "the certainty of

conviction" (*Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998)) reduces any

prejudice to Defendant.

### C.    Defendant's Mental Health

Last, the defense argues the Court erred in denying counsel's mid-trial motion

(Dkt. No. 942) for a mental health assessment and treatment of Defendant, and for

the Court to order further psychiatric evaluation before proceeding through the end

of trial.  The defense now moves the Court to revisit the question of Defendant's

competence to stand trial and, should the Court determine him to be competent,

grant him a new trial.  The Court incorporates by reference herein its decisions and

orders (Dkt. Nos. 899, 944) on the two emergency motions regarding Defendant's

mental competency and treatment, as well as its Decision and Order (Dkt. No. 1018,

pp. 4-7, 20-23, 34-35) on Defendant's motion to dismiss on Sixth Amendment

speedy trial grounds.  The latter Decision and Order summarized the decisions and

orders at Docket Numbers 899 and 944 and addressed Defendant's behavior during

trial but after the Court denied the second emergency motion on May 27, 2025.  No

further discussion on the Court's denial of the mid-trial motion is necessary, and for

those same reasons already provided by the Court, Defendant's Rule 33 motion on such ground is denied.

### D.    Right to a Fair Trial

The Court has given due consideration to each of Defendant's arguments concerning evidentiary rulings and for a new trial.  Considering each argument separately, and again in the aggregate, the Court finds the jury's verdict was not manifestly unjust.  Defendant's motion for a new trial is therefore denied.

### <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion (Dkt. No. 1035) for a judgment of acquittal or, alternatively, motion for a new trial, are DENIED.  Because of the delays in bringing this case to trial, and so that Defendant may pursue his appeal rights, the Court expects to impose sentence with as little further delay as possible. Defendant's sentencing remains scheduled for **October 27, 2025, at 11:30 a.m.** The parties are directed to the Court's accompanying Order for the submission of sentencing documents.


**SO ORDERED.**

_____s/Richard J. Arcara_____
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT


Dated:  September 19, 2025
         Buffalo, New York